JULY TERM, 1882, NO. 21.                    JANUARY 11, 1883.

## Appeal of Frederick Collins.

1. A valid and binding pledge can be given, of the interest of the pledgor, in a partnership to be subsequently created, so as to secure in a court of equity to the pledgee a priority of lien as against other unsecured creditors.

2. The existence of the subject of the pledge at the time the con-

[Appeal of Frederick Collins.]

tract of pledge is made is not at all necessary. If it comes into existence afterwards, it is affected in equity by the lien stipulated for.

3. By an instrument of writing, dated November 23, 1875, C agreed to advance to H $10,000, which H proposed to use as capital in an undertaking of himself and W, to furnish rolling-chairs for the Centennial Exhibition, and for the purpose of securing C, H pledged to him " all his, the said H's, interest in the said partnership, limited," of H and W, and further agreed to assign and deliver possession of all the said interest he holds in the partnership of H and W, that C might elect to demand such possession, and that H on request would execute all other instruments counsel would advise on purpose to carry this intention into effect. No such partnership as that of H and W was ever formed, but on February 9, 1876, a limited partnership, called the Centennial Rolling Chair Company, Limited, was organized, composed of H and W and four other persons, " for the business of furnishing for hire rolling-chairs for the accommodation and conveyance of persons within the grounds and buildings of the Centennial Exhibition." H put the $10,000, with an additional $2,410 advanced by C, into the capital of this partnership. He then died, and the fund in the Orphans' Court for distribution was solely the product of H's interest in the limited partnership.

*Held*, that the agreement of November 23, 1875, was a pledge of H's interest in the capital of a limited partnership, intended to be formed thereafter, and actually so formed, the purpose of which was to furnish rolling-chairs for the Centennial Exhibition, and that it sufficiently identified his interest in the partnership subsequently formed as the subject-matter of the pledge.

4. The pledgee was entitled to take from the fund in court $10,000 and interest in preference to the general creditors of the decedent.

5. There being no actual assignment, and no absolute or unqualified agreement to assign in the instrument of November 23, 1875, it cannot be regarded as an equitable assignment.

6. Though in all ordinary cases of pledge of personal chattels possession of the pledge by the pledgee is indispensable to the validity of the pledge, where the possession is by agreement of the parties to remain with the pledgor all are bound who claim under him except purchasers for value without notice.

7. In a litigation for the settlement of partnership affairs between partners, a decree of a joint and several judgment in favor of one of the partners against the others fixes the several character of the judgments as against each of the latter, and it cannot be inquired into in a collateral proceeding.

Before MERCUR, C. J.; GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ.

Appeal of Frederick Collins from the decree of the Orphans' Court of *Philadelphia County.*

In the Court below before the auditing judge, HANNA, P. J., the following facts appeared :

On November 23, 1875, Frederick Collins, the accountant, and Charles F. Hulse, the decedent, made the following agreement in writing :

" *Memorandum.*—WHEREAS, Frederick Collins has agreed to advance Charles F. Hulse $10,000, which said Hulse proposes to use as capital in an undertaking of

himself and Alexander W. Wister, to furnish rolling-chairs for the Centennial Exhibition; and the said Hulse, for the purpose of securing the said Collins for the said loan, and the repayment of the same, with interest, hereby pledges to the said Collins all his, the said Hulse's, interest in the said partnership, "limited," of Hulse & Wister; and he further agrees to assign and deliver possession of all said interest he holds in the partnership of Hulse & Wister at any time before the repayment of said loan to said Collins, that the said Collins may elect to demand such possession, when the agreement made by him, the said Hulse, for the proper conducting of the business aforesaid, shall be assumed and executed by the said Collins, and after the repayment of said loan and interest, and the necessary expenses attendant therefor, the excess of receipts for said business shall be paid to Elizabeth D. Hulse, the wife of the said Charles F. Hulse. On the assignment of said sum and interest as aforesaid, this agreement becomes null and void, and said Hulse retains the privilege of repaying the amount at any time he may decide, and also agrees on request to execute all other instruments counsel will advise, on purpose to carry this intention into effect.

Witness our hands and seals, this 23d day of November, 1875.

(Signed)          CHAS. F. HULSE. [SEAL.]
Witness at signing,
(Signed)   A. J. DIXON,
(Signed)   JOHN RODGERS."

The accountant advanced and loaned to decedent the sum of $10,000 mentioned in said agreement, and also the further sum of $2,410, making a total of $12,410, which he claimed to retain out of the estate of said decedent, of which he was the executor. No such partnership as that of Hulse & Wister was ever formed, but on February 9, 1876, a limited partnership, called the "Centennial Rolling Chair Company, Limited," was organized under the act of 2 June, 1874, and the persons who composed it were Charles F. Hulse, Thomas C. Price, Alexander W. Wister, William B. Rodgers, junior, Langhorn Wister, and Isaac Collins. The capital stock was $25,000, of which Charles F. Hulse held $12,500, and the others different sums aggregating $12,500. The certificate of organization recited that these parties "have entered into a limited partnership association for the business of furnishing for hire rolling-chairs for the accommodation and

[Appeal of Frederick Collins.]

conveyance of persons within the grounds and buildings of the Centennial Exhibition."

The $12,410, which Collins loaned to Hulse, was traced directly into this limited partnership and constituted its capital to that extent; and the fund for distribution is the sole product of Hulse's interest in said limited partnership.

The account of the executor shows the balance of principal for distribution to be $18,729 53.

The executors of George D. Parrish, deceased, also made claim to this fund. The said executors, in June, 1877, filed a bill in equity in the Court of Common Pleas, No. 2, against the members of the firm of Price, Parrish & Co., and this accountant, as executor of Charles F. Hulse, deceased, who had been a general partner in said firm, for the purpose of settling the accounts of said partnership; and on July 10, 1880, a final decree was entered making Frederick Collins, executor of Charles F. Hulse, deceased, and certain of the partners, jointly and severally indebted to the executors of George D. Parrish in the sum of $47,192 70.

Upon these facts, the auditing judge held that the fund should be divided *pro rata* between both claimants.

The accountant thereupon filed exceptions to the adjudication; and upon these exceptions, the Court below, PENROSE, J., delivered the following opinion:

"How far a partner, retaining his interest in an existing firm, may pledge it to secure a present advance, is a question which does not arise in this case. He certainly may assign out and out, and his assignee's title will be good as against creditors, without an actual delivery of possession of partnership effects. Such a delivery, as was said by Judge Sharswood, in Whigham's Appeal, 13 Smith, 194, would be impossible, since neither partner has anything in the *corpus* of the partnership property, but only a share of what remains after the accounts have been taken, and in that case a mere notice to the other partner of the transfer was held to be sufficient.

But when the instrument upon which the exceptant relies for the purpose of establishing his priority of right over the other creditors of the decedent was executed, there was no firm in existence. It recited that the borrower, Charles F. Hulse, (the decedent,) 'proposed to use the sum loaned as capital in an undertaking of himself and Alexander W. Wister, to furnish rolling-chairs for the Centennial Exhibition,' and as security for such loan, the interest of the said Hulse in said partnership, 'lim-

ited' of Hulse and Wister,' was thereby pledged, &c., &c., the said Hulse further covenanting 'to assign and deliver possession of all said interest he held in the partnership of Hulse and Wister, at any time before the repayment of said loan to said Collins, that the said Collins may elect to demand such possession,' &c., &c., and also, 'on request, to execute all the instruments counsel will advise, on purpose to carry this intention into effect.'

Not only was the firm, the decedent's interest in which was thus pledged, not in existence, but, as stated at the argument without contradiction, it never came into existence, the firm which three months later was formed being composed of Mr. Wister and the decedent and four others. For the purpose of this opinion, however, the firm actually entered into may be treated as that contemplated when the loan was made. The fact still remains that when the instrument stipulating for the pledge was executed, there was no existing interest upon which it could operate. There was nothing to prevent the borrower, after obtaining the money, from using it for any other purpose, and not entering into any partnership at all. A further act was at least necessary on his part, viz: the formation of the partnership. The lender trusted to his promise that this should be done, and to the covenant that then, if so required, he would execute an actual assignment and deliver possession, so far as the subject was susceptible of possession. The stipulation as to assignment cannot, therefore, be regarded as formal simply, or as a mere covenant for further assurance. It was essential for the perfection of the lender's title.

It is undoubtedly true, as was said by TILGHMAN, C. J., in Clemson v. Davidson, 5 Binney, 398, cited by the exceptant, that 'any order, writing, or act, which makes an appropriation of a fund, amounts to an equitable assignment of that fund;' but, as was held in that case, the principle cannot apply where the subject of the attempted appropriation was not in existence at the time. 'An agreement to pay out of a particular fund, however clear in its terms, is not an equitable assignment. A covenant in the most solemn form has no greater effect. The phraseology employed is not material, provided the intent to transfer is manifested. Such an intent and its execution are indispensable. The assignor must not retain any control over the fund, any authority to collect, or any power of revocation. If he do, it is fatal to the

claim of the assignee:' Christmas *v.* Russell, 14 Wallace, 69, 84.

'To constitute an assignment, either in law or equity, it is necessary that there should be such an actual or constructive appropriation of the subject-matter assigned as to confer a complete and present right in the assignee, even where the circumstances do not admit of its immediate exercise. A covenant on the part of the debtor to apply a particular fund in payment of the debt as soon as he receives it will not operate as an assignment, for it does not give the covenantee a right to the fund save through the medium of the covenantor, and looks to a future act on his part as the means of rendering it effectual, while the characteristic of an assignment is the extinguishment of all legal or equitable interest of the assignor, and the creation of a new and independent right in the assignee:' 2 Select Cases in Equity, 233.

After the formation of the partnership, it was in the power of the lender to have perfected his title by calling for an assignment, but he did not do so. His debtor died. 'His personal estate then passed into the custody of the law for administration, and the mortgagee had no right to undertake to administer any part of it for the satisfaction of his own debt:' Kater *v.* Steinruck, 4 Wright, 505.

The fund came, as the account shows, into the hands of the exceptant as executor, and at that time, as we think, could have been received by him in no other capacity. It was subject to no lien, and, therefore, properly distributable among the general creditors of the decedent.

Nor do we think that the exceptant was the only creditor having the right to come upon the separate estate of the decedent.

The debt to George D. Parrish's estate was not a partnership debt. It grew out of the business of the firm of Price, Parrish & Co., of which he and the decedent had been members, but the affairs of that firm had been settled by a litigation in Common Pleas No. 2, in which it was found, and was so decreed, that of the debt of the firm to George D. Parrish, (composed of him and five others,) the decedent and three of the members were jointly and severally liable to his executors for $47,192 70, and another member, James C. Parrish, for $52,574, making in all $99,766 70.

It is true that it was found that the debt of the decedent to the firm was but $18,352 39, and that, as between

himself and the other three joint debtors, the amount should be contributed by Stephen S. Price and Thomas C. Price in the proportions mentioned in the decree. But this, while it will entitle the accountant to proceed against the parties primarily liable, can not impair the right of the creditor to recover from the decedent in the first instance. And it is clear that a debt due by any number of partners less than the whole, to one of the others, or to a stranger, cannot be regarded as a partnership debt.

The rule which postpones partnership creditors in the distribution of the separate estate of a partner has never been extended to mere joint, as distinguished from partnership liabilities; and even a partnership creditor by joint and several bond may elect to come in as a separate creditor, though by so doing he abandons his claim on the joint estate: Ex parte Banks, 1 Atk., 166; Ex parte Bevan, 10 Vesey, 107; Bell v. Newman, 5 S. & R., 90; Lindley on Partnership, *1014."

1st April, 1882. The exceptions are dismissed, and the adjudication confirmed.

The accountant then appealed, and assigned the following errors:

The Court below erred—

*First.* In dismissing the exceptions.

*Second.* In confirming the adjudication.

*Third.* In not awarding to the appellant, as a creditor of the decedent's estate, and as pledgee and assignee by virtue of the writing, dated 23d November, 1875, the sum of $10,000, with interest, from the dates of advances to that amount.

*Fourth.* In not awarding to the appellant, as the only creditor of the decedent's separate estate, payment of his claim, $12,410, with interest from its date, in full and in priority to the claims of the estate of George D. Parrish against the decedent as a partner of Price, Parrish & Co.

*C. Stuart Patterson* and *Richard C. McMurtrie* for appellant.

The statute of 13 Eliz., which avoids fraudulent deeds, excepts conveyances upon good consideration and *bona fide.* To prevent a transfer from being fraudulent as to creditors, only such delivery is required as accords with the nature of the property: Twyne's Case, 1 Sm. L. C., 25; Cowper, 424, 708; 11 Wheaton, 199; 5 S. & R., 275; 4 Dallas, 280; 3 Binney, 400; 4 *Ibid.*, 258; 2 Pen. & W.,

[Appeal of Frederick Collins.]

263; 9 P. F. Sm., 466; 5 W. & S., 145; 6 Harris, 60; 3 Phila., 137, 138; 7 Barr, 89; 3 Gr., 237; 1 Phila., 104; 1 W. N. C., 442; 23 P. F. Sm., 378; 13 P. F. Sm., 194.

The appellee can claim no greater right than the decedent could claim as against the appellant: Bispham's Eq., sec. 168; 6 DeG., M. & G., 492; L. R. 3 C. P., 235, 248; 23 P. F. Sm., 162; 27 *Id.*, 378; 11 S. & R., 377.

The agreement constituted a pledge, or equitable assignment, although the property was not susceptible of an immediate transfer of possession: 3 L. C. in Equity, 361 (3d Am. Ed.); 2 *Id.*, 1644 (4th Am. Ed.); Rawlyn's Case, 4 Rep., 53; 2 S. & R., 518; 11 S. & R., 391; 4 Wr., 43; Hobart, 132; 18 Vt., 461; 5 M. & S., 203; 8 Price, 273; 1 Hare, 549; 10 H. L., 191; 2 Story, 361; 3 Phila., 173; 4 Wr., 276; 14 P. F. Sm., 366; 23 P. F. Sm., 216; 8 W. N. C., 195; 2 Story, 555; Turner & Russell, 469; 1 Ves., Jr., 478; and the appellant was not bound to take possession of the property pledged, the appellees being antecedent creditors.

The death of the assignor does not prejudice the rights of the appellant as an equitable mortgagee: 9 Jur. N. S., 1220; 8 Ohio N. S., 521; 13 *Id.*, 574; 3 Binn., 401; 2 Binn., 122.

The fund for distribution is the separate estate of decedent, and the claim of the appellee is a partnership debt. The claim of appellant being a separate debt is, therefore, entitled to preference over the partnership debt: 5 S. & R., 94; 8 Wr., 503; 8 W. N. C., 456; 5 P. F. Sm., 252; Bispham's Eq., sec. 517; 8 Howard, 414; 3 Kent's Com., 65, note; Notes on Silk & Prime, 2 L. C. in Eq., 353; 3 Paige, 167; 4 DeG., J. & S., 537; L. R. & Ch., 441; 1 Casey, 216; 4 Casey, 524; 8 Wr., 503; Buck, 455; *Id.*, 347; 4 DeG., J. & S., 550; 17 Ves., Jr., 115; 1 Rose, 212; 1 Ves., Jr., 165; 2 D. & Ch., 186; 9 Ves., Jr., 588; 6 Paige, 20; 15 S. & R., 153; 8 Casey, 202; 5 P. F. Sm., 252; 30 *Id.*, 250.

*William C. Hannis* and *E. Hunn Hanson* for appellees.

As between creditors of decedent, the agreement is invalid, whether considered as a pledge or an assignment. Any pledge or mortgage of personal property is void as to existing as well as subsequent creditors, unless delivery is made at the time, where the property is capable of delivery.

As an assignment, there must be a present appropriation of the subject-matter to the assignee. The agree-

ment here was only an intention to assign : 2 Select Cases in Eq., 233 ; 21 Wallace, 447 ; 43 Barb., 291 ; 22 P. F. Sm., 13 ; 11 Norris, 196 ; 14 Wallace, 69 ; 3 Beas., 234 ; 2 Jones, 66 ; 23 P. F. Sm., 162.

The death created a fixed relation with regard to the creditors, the law taking hold of the estate for the benefit of all : 4 Wr., 501 ; 4 P. F. Sm., 200 ; 1 P. & W., 147.

Decedent's indebtedness to assignees was a partnership debt, there being a final settlement of the partnership accounts by the decree of the Court of Common Pleas, making the liability joint and several.

October 2, 1883.    The opinion of the Court was delivered by GREEN, J. :

If the instrument of the 23d November, 1875, constituted a valid, equitable pledge of the interest which produced the fund for distribution, the other contentions in the case become immaterial, and will not require consideration.    Of course, there is no pretense of a legal lien, but a pledge in equity available to the pledgee does not depend upon the considerations which are requisite to the creation of a lien at law.    The chief objection to the operation of the instrument in question as a pledge is that "the thing proposed to be pledged, that is, Hulse's interest in a partnership between him and Alexander W. Wister, never came into existence," and, therefore, there was nothing upon which the paper could operate.    Designated with precision by its legal name, the interest which produced the fund was a one-half interest in the capital stock of a limited partnership, called "The Centennial Rolling Chair Company, Limited."    The partnership was organized under the act of 2d June, 1874, and the persons who composed it were Charles F. Hulse, Thomas C. Price, Alexander W. Wister, William B. Rogers, Jr., Langhorne Wister, and Isaac Collins.    The capital stock was $25,000, of which Charles F. Hulse held $12,500, and the others different sums, aggregating $12,500.    The agreement creating the partnership was dated, signed, and acknowledged on February 9th, 1876, and recorded on the 11th, two days later.    The certificate of organization recites that the parties, naming them all, "have entered into a limited partnership association for the business of furnishing, for hire, rolling-chairs for the accommodation and conveyance of persons within the grounds and buildings of the Centennial Exhibition, under and by virtue of the act of Assembly of the Commonwealth of Pennsylvania, approved the 2d day of June, A. D. 1874.    The

fifth clause of the certificate is in the following words: "The general nature and character of the business intended to be transacted by the said partnership association is the furnishing, for hire, of rolling-chairs for the accommodation and conveyance of persons within the grounds and buildings of the Centennial Exhibition, and the office of said association is to be located in the city of Philadelphia." There is nothing in the other parts of the certificate which conflicts in any manner with the foregoing description of the purpose, character, and object of the undertaking or enterprise in which the parties to it engaged.

The paper of November 23, 1875, thus describes the subject of the pledge: "Whereas, Frederick Collins has agreed to advance Charles F. Hulse $10,000, which said Hulse proposes to use as capital in an undertaking of himself and Alexander W. Wister, to furnish rolling-chairs for the Centennial Exhibition ; and the said Hulse, for the purpose of securing the said Collins for the said loan and the repayment of the same with interest, hereby pledges to the said Collins all his, the said Hulse's, interest in the said partnership, "limited," of Hulse and Wister ; and he further agrees to assign and deliver possession of all said interest he holds in the partnership of Hulse & Wister at any time before the repayment of said loan to said Collins, that the said Collins may elect to demand such possession when the agreement made by him, the said Hulse, for the proper conducting of the business aforesaid shall be assumed and executed by the said Collins, and after the repayment of said loan and interest, and the necessary expenses attendant therefor, the excess of receipts for said business shall be paid to Elizabeth D. Hulse, the wife of the said Charles F. Hulse."

This paper is very defectively and inaccurately drawn, and it is owing to this fact that the present litigation has arisen. There was no partnership of Hulse & Wister, or of them with other persons, in existence at the time the instrument was executed, yet, in the second and third clauses of the paper, a partnership is referred to as already in existence, and in the definite name of Hulse & Wister. It is this confusion of reference that occasions the dispute as to the meaning of the whole instrument. To understand just what it was that the parties were negotiating about, we must refer to the recital in which the very subject-matter of the joint enterprise which was proposed to be established or engaged in is more accurately described. In substance, it is this: Collins agrees

to lend Hulse $10,000 to be used by the latter as capital in an undertaking of himself and Wister to furnish rolling-chairs for the Centennial Exhibition. Now, this "undertaking" had not then been brought into existence, but that is precisely what was subsequently done by the organization of the limited partnership. Hulse and Wister did thereby engage "in an undertaking" to furnish rolling-chairs for the Centennial Exhibition. It is true others joined them in the enterprise, but that circumstance does not alter the fact that Hulse and Wister engaged in it, and it is entirely immaterial, as the interests of the other parties do not affect any present question between these parties. If Hulse and Wister had alone established the partnership and the others had subsequently acquired their interests, it could hardly be pretended that the partnership referred to in the paper had never come into existence, yet whether the interests of the other parties were acquired originally or subsequently can certainly make no difference. At least three persons would be absolutely requisite to the creation of any "limited" partnership under the act of 1874, and as that kind of a partnership appears to have been contemplated by the paper, other persons than Hulse and Wister must necessarily have joined therein. Moreover, there is no express engagement or necessary inference that other persons were not to be interested in the proposed partnership, and the fact that there were such is therefore not inconsistent with the actual intent of the parties in their description of the subject-matter of the pledge. It seems to us the only material question in the controversy on this branch of the case is as to the identity of the subject-matter of the pledge with the description of it contained in the paper. It is not at all disputed that the fund for distribution was the sole product of Hulse's interest in the capital of "an undertaking" "to furnish rolling-chairs for the Centennial Exhibition." It is equally certain that Hulse and A. W. Wister were parties to that undertaking. It is not pretended there was any other undertaking of this nature in which these two persons were interested, and it is asserted, and not denied, that the very sum of $10,000 which Collins loaned to Hulse was traced by the testimony directly into this limited partnership, and constituted its capital to that extent. The actual sum loaned was even more—$12,410—the whole of which went into the partnership. Now the material part of the description of the subject of the pledge contained in the paper of November 23, 1875, is "capital in an un-

dertaking to furnish rolling-chairs for the Centennial Exhibition." This is a description of the thing itself, and it is literally complied with by the subject-matter which produced the fund in Court. The subsequent language is rather of reference than description, thus : "The said Hulse's interest in the said partnership 'limited' of Hulse & Wister." There was no "partnership limited" previously described, and the only antecedent of the whole phrase is the "undertaking" to furnish rolling-chairs. It is perfectly plain to us that the second phrase is a mere careless and inartistic reference to the actual subject more accurately described in the first sentence. The two are not necessarily inconsistent. They were intended to relate to, and indicate, the same thing. Moreover, the parties may then have supposed that the partnership, when formed, would be named "Hulse & Wister," and therefore referred to it by that name, and yet, when it came to be established, may have decided to give it another name. If the actual partnership subsequently created was the same one which the parties in reality contemplated and provided for in executing the written pledge, it is certainly unimportant whether the name of it, which at best was arbitrary, remained the same or was changed. Had the words, "his, the said Hulse's, interest in the said partnership, limited, of Hulse and Wister," been the only words in the instrument describing the subject of the pledge, the case would have been different. But such is not the fact, and we read the instrument in accord with the manifest intent of the parties when we hold that it was a pledge of Hulse's interest in the capital of a limited partnership intended to be formed thereafter, and actually so formed, the purpose of which was to furnish rolling-chairs for the Centennial Exhibition. This being so, the paper must have the same legal effect as if it had contained an accurate description of the subject of the pledge, that subject having produced the fund for distribution. This raises the only remaining question, to wit : Whether a valid and binding pledge can be given, of the interest of the pledgor, in a partnership to be subsequently created, so as to secure to the pledgee a priority of lien as against other unsecured creditors. In such a case, the subject of the pledge is necessarily incapable of manual possession or of actual delivery. It is in no sense a specific chattel, and even as a chose in action, it cannot be enjoyed in possession until after the partnership has been closed, the debts paid, the rights of the partners as be-

tween themselves adjusted, and the resulting amount due the pledgor ascertained. The interest comes into existence as soon as the partnership is created, but it is an uncertain quantity until dissolution and final settlement. It is intangible as a *res*. It may be something or it may be nothing. But in legal and in equitable contemplation, it is an entity which may be subject to any kind of contract relation which is possible to such forms of property. Partnership interests are of infinite variety and of enormous extent and value. In the business world they are the subjects of daily transactions in all civilized societies. Within the limitations which arise out of their peculiar characteristics, they may be dealt with as other personal property. One objection to the validity of the pledge in the present case is that the interest in question had no existence at the date of the instrument creating the pledge, and for this reason also there was nothing upon which it could operate.

Indeed, that was the ground upon which the learned Court below decided the case against the appellant. But in other forms of property that objection does not avail. In the case of Railroad *v.* Wœlpper, 14 P. F. S., 366, SHARSWOOD, J., said: "But it is objected that no person, natural or artificial, can grant what he does not possess or own at the time of the grant. *Qui non habet, ille non dat.*

Yet, even at law, this rule is not without some qualifications. A man may grant the future accretions, or increase of any subject which he owns at the time of the grant, as all the wool which shall grow on his sheep for a term of years." * * * "But it is not necessary to maintain that the rolling-stock and equipments of a railroad are part of its accretions and fixtures, so as to make the transfer good at law. It is unquestionably good in equity. Contingent estates and interests, though not assignable at law, are assignable in equity; and they may also be the subject of a contract, which, when made for valuable consideration, will be specifically enforced when the event happens." * * * "It is a plain corollary from these principles that a court of equity will treat a mortgage of property to be subsequently acquired, whether it be real or personal, as a binding contract, which attaches to the thing when acquired. Equity considers that as actually done which a chancellor would decree to be done."

Judge Story, in his work on Equity Jurisprudence, section 1039, says: "To make an assignment valid at law,

the thing which is the subject of it must have actual or potential existence at the time of the grant or assignment. But courts of equity will support assignments not only of choses in action and of contingent interests and expectancies, but also of things which have no present, actual, or potential existence, but rest in mere possibility, not, indeed, as a present positive transfer, operative *in presenti,* for that can only be of a thing *in esse,* but as a present contract, to take effect and attach as soon as the thing comes *in esse.*" In the case *In Re* Ship Warre, 8 Price, 273, an assignment of the freight and earnings of a voyage yet to be made was upheld in equity. Lord Eldon said: "I am not aware that it has ever been ruled in equity, and I apprehend that it has not, that the freight of a voyage that is intended to be made, although not an existing voyage, may not be assigned in equity." In Mitchell *v.* Winslow, 2 St. Rep., page 631, the Court sustained the validity of a mortgage of all tools and machinery which might be purchased, and all cutlery stock which might be manufactured or purchased during a period of four years from the date of the mortgage. In the case of Holroyd *v.* Marshall, 10 House of Lords cases, 191, Westbury, L. C., said: "But if a vendor or mortgagor agrees to sell or mortgage property, real or personal, of which he is not possessed at the time, and he receives the consideration for the contract, and afterwards becomes possessed of property answering the description in the contract, there is no doubt that a court of equity would compel him to perform, and that the contract would, in equity, transfer the beneficial interest to the mortgagee or purchaser immediately on the property being acquired. This, of course, assumes that the supposed contract is one of that class of which a court of equity would decree the specific performance. If it be so then, immediately on the acquisition of the property described, the vendor or mortgagor would hold it in trust for the purchaser or mortgagee, according to the terms of the contract." Lord Chelmsford said: "At law property non-existing, but to be acquired at a future time, is not assignable; in equity, it is so. At law, although a power is given in the deed of assignment to take possession of after-acquired property, no interest is transferred unless possession is actually taken; in equity, it is not disputed that the moment the property comes into existence the agreement operates upon it." These principles have been recognized and enforced in this Court. In McWilliams *v.* Nisley, 2 S. & R., 518,

Gibson, J., said: "In equity, a grantor conveying land for which he has no title at the time shall be considered a trustee for the grantee, in case, at any time afterwards, he should acquire title." In Chew *v.* Barnet, 11 S. & R., 391, it was said: "The facts presented constitute the ordinary case of a conveyance before the grantor has acquired the title, in which the conveyance operates as an agreement to convey, which, when the title has been subsequently acquired, may be enforced in chancery." In Bayler *v.* The Commonwealth, 4 Wright, 43, Strong, J., says: "But though a conveyance of an expectancy as such is impossible at law, it may be enforced in equity as an executory agreement to convey if it be sustained by a sufficient consideration. This has often been decided. It is unnecessary to prolong these citations. They prove clearly that the existence of the subject of the pledge at the time the contract of pledge is made is not at all necessary. If it comes into existence afterwards, it is affected, in equity, at once by the lien stipulated for.

There is no doubt that the principles illustrated by the foregoing decisions are applicable to cases of sales, absolute assignments, and mortgages. But owing to the peculiar character of the instrument executed by Hulse, in this case, we have had much doubt whether they were applicable to this particular contract. The difficulty has been that while there is a distinct pledge, in terms of present operation, of the interest of Hulse in the contemplated undertaking and partnership, there is no actual assignment and no provision for absolute assignment.

An assignment is provided for, and we could readily hold it to be an equitable assignment, if it were not for the fact that the obligation of Hulse to make it only arose after demand made on the part of Collins, and no such demand was ever made. The obligation to assign, therefore, not having arisen under the express terms of the contract, and there being no actual assignment, and no absolute or unqualified agreement to assign, contained in the instrument, we find what seems to us an insuperable difficulty, under the authorities, in the way of treating this paper as an equitable assignment of Hulse's interest in the proposed partnership. We think, also, it is not practicable to regard the indebtedness of Hulse to George D. Parrish's estate as a partnership debt. Whatever might have been its quality in this respect prior to the decree finally made in the litigation for the settlement of the affairs of Price, Parrish & Co., when that decree was

[Appeal of Frederick Collins.]

made, it was a several as well as a joint judgment against Hulse's executor. We do not see how we can go behind that decree in this case to inquire into the original character of the indebtedness, or into the reasons for making it several as well as joint. It is the final judgment of a Court, of competent jurisdiction, having the parties and the cause before it.

The question then recurs, Can the lien of the appellant be enforced as a technical pledge of Hulse's interest in the partnership? His equity is very great. The testimony proves distinctly that the money loaned by him to Hulse went directly into the partnership, and formed part of its capital, and, therefore, was the means—the sole means—of producing the fund to be now distributed. At the time it was loaned, it was upon a distinct and absolute pledge of Hulse's interest, in terms of present operation. It could not operate immediately, because the subject of the pledge was not then in existence; but, as we have heretofore seen, that circumstance is, in equity, immaterial, and it became operative as soon as the interest was created. It is effective, therefore, so far as such a pledge of such a subject can be effective. Is it sufficiently so to give the appellant the money which is the product of the interest pledged, as against the appellee? The appellee is not a purchaser; he is but a creditor, and he has not the rights which could be asserted by a purchaser for value, and without notice. He is not a creditor subsequent to the creation of the partnership, but anterior thereto; and, therefore, cannot assert that his credit was given on the faith of the apparent ownership of this interest by Hulse. He is not a creditor who had levied on the interest of Hulse and sold it upon execution, and purchased it at such sale. He is but a general creditor of Hulse, without any equity, except such as all creditors of that class have upon the assets of their debtor. Notwithstanding all this, he is entitled to share this fund, *pro rata*, with the appellant, unless the latter can sustain his claim of lien upon the fund.

The only difficulty that lies in the appellant's way, in this respect, grows out of the consideration that possession of the subject of the pledge is an almost universal requirement in the law of pledge to perfect the pledgee's title. It may be dispensed with in certain cases, but the current of the authorities is that in such cases there must be a substitute for it, in the way of a transfer of the title, in such manner that the pledgee can exercise a right of possession without any further act of the pledgor. For-

[Appeal of Frederick Collins.]

merly no distinction was taken between a pledge and a mortgage of chattels. They were both regarded as a security for a debt, and the title of the pledgee was considered as substantially the same in both cases. In the case of Cortelyou v. Lansing, 2 Caines, Cases in Error, 200, Chancellor Kent points out an important distinction, which was then but recently observed, to wit: That in a pledge, the general property remains with the pledgor, and only a special property passes to the pledgee, and hence, on a failure to redeem, the pledgee has no right to sell or appropriate the pledge, while a mortgage of chattels passes the absolute title, subject to a defeasance, and upon a failure to redeem, the title of the pledgee becomes perfect. Not stopping to inquire whether this would be the law in Pennsylvania at this day, it is, nevertheless, the fact that a mortgage in its ordinary form contains an absolute transfer, or assignment, of the title, with a provision for a defeasance, upon payment of the debt, added. In this respect, therefore, there being an actual assignment of the title, there is sufficient, in equity, to create an available lien in the mortgagee. Nothing further remains to be done by the mortgagor to perfect the mortgagee's title. But in the case of a bare pledge, without an assignment, or, at least, an unqualified agreement to assign, the title of the pledgee seems to be defective without a further act of the pledgor. The distinction is, doubtless, refined; but it appears to be substantial.

There is, however, a class of cases in which it is disregarded. They are cases in which the possession of the pledge is, by *the agreement* of *the parties*, to remain with the pledgor. It is held that as the pledgor is bound notwithstanding this provision of the contract, so all are bound who claim under him, except purchasers for value and without notice. The doctrine has been applied in the case of specific chattels, and it would apply with much more force in the case of expectancies or intangible interests. Thus in the case of Reeves v. Capper, 5 Bing., N. C., 136, one Wilson, the captain of a ship, pledged his chronometer, which was then in the possession of the makers, to the Messrs. Capper, the defendants, who were the owners of the ship, in consideration of their advancing him 50l. and allowing him the use of the instrument during the voyage on which he was about to depart; after the voyage, he placed it at the makers and there pledged it to the plaintiff, for whom, the makers being ignorant of the pledge to the defendants, agreed to hold it; the money advanced by the defendants not having been re-

paid, it was held that the property in the instrument was in the defendants. In point of fact, the chronometer was delivered by the makers to the defendants' clerk, who immediately re-delivered it to the pledgor, and it was contended by the plaintiff that the defendants, having parted with their possession, had lost their lien, but it was held that as this was done in accordance with the terms of the contract, the lien was not lost. For this purpose the Court said that Wilson, the pledgor, could be regarded as the servant of the pledgees, and that his possession was their possession. But substantially it was because the possession was in accordance with the terms of the contract that the lien was enforced even against another *bona fide* creditor who had loaned his money upon the pledge of the same chattel, while in the control of the pledgee, and without notice of the previous pledge. In the case of Meyerstein *v.* Barber, L. Rep., 2 C. P., 38, NILLS, J., said : "But in order to complete the pledge, it is not necessary that there should be an actual delivery of the chattel to the pledgee ; it is sufficient, as was decided in Reeves *v.* Capper, 5 Bing., N. C., 136, (E. C. L. R., vol. 35, p. 54,) 6 Scott, 877, and the other cases to which reference was made in the course of the argument, if there be a constructive delivery. It is not necessary that the subject of the pledge should actually pass from the hands of the pledgor to those of the pledgee. The property in the goods may pass, even though they remain in the possession of the pledgor, provided they do so by virtue of a contract between the parties which makes the custody of the pledgor, the custody of the pledgee." In the case of Fletcher *v.* Morey, 2 St. Rep., 555, James Reed & Co., of Boston, agreed with Fletcher, Alexander & Co., of London, by a written agreement, that the latter firm should honor bills drawn on them in payment of goods purchased for Reed & Co., and to secure Fletcher, Alexander & Co., it was agreed that all the property purchased by means of the credit, and the proceeds thereof, "and the policies of insurance thereon, together with the bills of lading, are hereby pledged and hypothecated to them as collateral security for the payment as above promised, and held subject to their order on demand, with authority to take possession and dispose of the same at discretion for their security or re-imbursement."

Goods were purchased for Reed & Co., and bills drawn on and accepted by Fletcher & Co. to pay for them.

Reed & Co. became bankrupts.  Some of the goods came
to the assignees in bankruptcy, and some to Reed & Co.,
for which the bills of lading were received by them and
indorsed to the plaintiffs, who filed a bill against the as-
signee to have a lien declared in their favor against all
the goods, and the proceeds of such as were sold.   The
Court sustained the bill, holding that the plaintiffs were
entitled to recover on their contract of pledge, although
as to some of the goods they never had any kind of pos-
session of them, and as to others to which they were en-
titled to possession, by virtue of the bills of lading, they
had parted with it.   Story, J., said, on page 565 :  "This,
then, being the established principle, the first question
which arises in the case is, whether there is any equitable
lien or right, or claim, under the agreement which ought
to be enforced specifically in equity against the shipments
made to and for Messrs. Reed & Co., or the proceeds
thereof, so far as they can be distinctly traced in the
hands of the assignee, and upon this point I entertain no
doubt whatever.   In equity, there is no difficulty in en-
forcing a lien, or any other equitable claim, constituting
a charge *in rem*, not only upon real estate, but also upon
personal estate, or upon money in the hands of a third
person, whenever the lien, or other claim, is a matter of
agreement against the party himself and his personal
representatives, and against any persons claiming under
him, voluntarily or with notice, and against assignees in
bankruptcy, who are treated as volunteers ; for every
such agreement for a lien or charge *in rem* constitutes a
trust, and is, accordingly, governed by the general doc-
trine applicable to trusts."     *     *     *     "So that, as a
matter of trust directly growing out of, and provided for,
by contract, the present case falls directly within the prin-
ciple above stated.   The goods, and the proceeds thereof,
are expressly, *by the agreement of the parties*, 'pledged
and hypothecated' as collateral security for the advances.
*     *     *     "But it is said that the agreement, if en-
forced, will operate as a fraud upon the creditors of Reed
& Co., under their bankruptcy, and, indeed, that an
agreement of this sort, so far as respects creditors, is
void as against the policy of the law, and in derogation
of the rights of creditors.   Now, it is not pretended, nor
even suggested, that any fraud was, in fact, contemplated
by the parties, or any of them, upon the creditors.   The
transaction was *bona fide*, for a valuable consideration;
and for future advances to promote the commercial busi-
ness of the firm of Reed & Co., and not to withdraw any

[Appeal of Frederick Collins.]

of their existing funds from their creditors.    *    *    How, then, it is against the policy of the law, I confess myself unable to perceive, unless we are prepared to say that taking collateral security for advances upon existing or future property on the part of a creditor, without taking possession of the property at the same time, or when it comes *in esse*, is, *per se*, fraudulent.    Possession is ordinarily indispensable at the common law to support a lien, but even at the common law it is not absolutely indispensable in all cases.    This is shown by the recent case of Dodsley *v.* Varley, 12 Adolph & Ellis, 632, where goods had been sold and deposited in the warehouse of a third person for the vendee ; but still it was understood between the parties that the vendee was not to remove them until payment therefor, and it was held by the Court that, although the warehouse must be considered as the vendee's warehouse, and be in the actual possession of the goods, yet, ' consistently with this, the vendor had not what is commonly called a lien determinable upon possession, but a special interest, sometimes, but improperly, called a lien, growing out of the original ownership, independent of the actual possession, and consistent with the property being in the vendee.'    What is this but allowing the existence of an equitable lien, notwithstanding the possession of the goods is parted with, good between the parties, and good as to all persons not claiming under the vendee as *bona fide* purchasers, for a valuable consideration, without notice ?

But I take it to be clear that not only liens, but mortgages of personal property, are perfectly good and supportable between the parties, and against creditors, where there is no fraudulent intent, and the possession remains in the owner or mortgagee of the property, and is consistent with the deed and the arrangements made between the parties."    Judge Story concludes his view of the case thus : "So that the possession of the property by Messrs. Reed & Co., in the present case, is not, in my judgment, a badge of fraud, or against the policy of the law, or in any manner to be deemed inconsistent with the just rights of their creditors, and, therefore, the agreement is binding and valid to give a lien or equitable charge upon the property in the hands of the assignee, fit to be enforced in the present suit."    In other words, although this was a case of a pledge of personal chattels, wherein, in all ordinary cases, possession by the pledgee is indispensable to the validity of the pledge, and the title to, and possession of, the goods agreed to be pledged

[Appeal of Frederick Collins.]

had passed to the pledgor, the mere agreement for such possession suffices to protect the lien, and was good against the parties and the general creditors of the pledgors. The same doctrine was held and applied in the case of Mitchell *v.* Winslow, 2 St. Rep., 630, in which Judge Story, on page 644, said : "It seems to me a clear result of all the authorities, that wherever the parties by their contract intend to create a positive lien or charge, either upon real or personal property, whether then owned by the assignor or contractor or not, or if personal property, whether it is then *in esse* or not, it attaches in equity, as a lien or charge upon the particular property, as soon as the assignor or contractor acquires a title thereto, against the latter, and all persons asserting a claim thereto, under him, either voluntarily, or with notice or in bankruptcy." He then proceeds to answer the argument that the possession of the property remaining in the mortgagor would operate as a constructive fraud upon the rights of creditors. After showing it was inapplicable in cases of mortgages upon real estate, he says : "And as to chattels, there is as little question that where a mortgage or a lien is created on chattels by contract, it is entirely competent for the parties to agree that the possession and use thereof shall be retained by the mortgagor until the breach of the condition, or by the debtor, until the creditor shall assert his rights against it as a security for the debt." Although this was the case of a mortgage of chattels, the decision was not put upon the ground that there was a transfer of title, but upon the broader ground of an agreement for the possession by the owner, and a lien for the lender, and in all such cases it was held the creditor could avail himself of his lien against creditors of the debtor, by force of the agreement for the lien. Judge Story cites two cases, both of which were agreements for liens merely, though in one, Crowfoot *v.* London Dock Co., 2 Cromp & Mees, 637, there was a mixed possession of the chattels, both by the creditor and the debtor. In the other, Hawthorn *v.* Newcastle and North Shields Railway Co., reported in 3 Ad. & Ell., N. S. page 734, note b, the lien was limited to certain machines, implements, and materials, (used by and belonging to a contractor in building a bridge,) which might be upon the lands or ground where the bridge was being built. It was held that by necessary implication the agreement for the lien included property which was upon other lands where the work was being carried on in

the popular sense, so that the company might be considered as having possession of the articles there placed.

In both of these cases, the chattels belonged to and were in the possession and use of the debtor, and might at any time be removed by him, but the lien was enforced chiefly on the ground of the agreement, and partly because there was a mixed possession of both debtor and creditor. In Macomber *v.* Parker, 14 Pick, 497, which was a case of a pledge by a brickmaker, of bricks to be made in the future, to the lessees of the yard to secure them for advances, the lien was enforced againt creditors of the pledgee. The Court said, on page 505: "It was an agreement for the pledging of the bricks as they should be made. It is true that where the property is to be thereafter acquired it is not strictly and technically a pledge; it is rather an hypothecation; but when the title is acquired *in futuro*, the right of the pledgee attaches immediately upon it." Here the brickmaker was in possession of the yard, and hired men, and manufactured the bricks, and he was also the agent of the plaintiffs, who were assignees of the lessees, for selling the bricks. In all respects he had the actual possession of the premises and the bricks, but the Court considered that, with the agreement for a lien, and the technical legal possession of the assignees of the lessees, there was a sufficient basis for sustaining the lien, although against the creditor of the pledgee, who was, to all intent and purposes, the owner and in possession of them.

The foregoing cases all relate to liens upon specific chattels, as to which it is almost universally necessary that possession should accompany the pledge in the hands of the pledgee, in order to validate his lien. But we have seen that this requirement may be dispensed with if such is the agreement of the parties, and the lien of the pledgee may be enforced by virtue of the contract. It seems to us that this doctrine applies with much greater force to cases where the subject of the pledge is a mere intangible right, incapable of delivery or of manual occupancy, and especially where it is to come into existence after the contract of pledge is made, and where the personal effort of the pledgee is necessary, both to its subsequent existence and its actual maintenance. All these features concur in the present case. The thing pledged is an interest in a partnership to be created in the future. Such an interest is described by SHARSWOOD, J., in Whigham's Appeal, 13 P. F. S., on p. 198, as "an incorporeal-intangible thing—a right to an account and to their share of the

balance after all the debts are paid and all equities between the parties are adjusted.''

By the very terms of the paper of 23d November, 1875, this proposed partnership was to be created by the act of Hulse and others, and, of course, it could only be maintained by the joint acts of himself and his partners. Now, it is an inevitable inference, both from the character of the transaction and the words of the paper, that it was the understanding and agreement of Hulse and Collins, that Hulse should be in possession of this partnership interest because Hulse contracts that he will assign and deliver possession of the interest to Collins at any time on demand of the latter, and thereafter Collins should assume and execute the business of the partnership in place of Hulse. All this presupposes the actual primary and continuous possession of the interest by Hulse until the assignment is made. Such being the case, we have no difficulty in reading this paper as an actual present pledge by Hulse to Collins of a partnership interest which he was to acquire in the future with the money loaned him by Collins, that Hulse was to be in possession of the interest until such time as Collins might demand an assignment of it, and upon such demand being made, Hulse was to make the assignment and "to deliver possession of all said interest" to Collins. This being so, the interest was subject to the operation of the pledge in equity from the moment it came into existence. It was binding upon Hulse, notwithstanding his possession, because such was his contract, and for that reason it is binding upon all claiming under him, except purchasers for value and without notice. The appellees' testator was not such a person, but a mere general creditor, whose right is inferior and subordinate to that of the appellant. We hold, therefore, that the appellant is entitled to take out of the fund for distribution the sum of $10,000, with interest from date of the loan, by virtue of his equitable lien upon Hulse's partnership interest, the proceeds of which constitute the fund. As to the remaining $2,410 of his claim, he is an unsecured creditor, and can only take a dividend *pro rata* with the appellees and other creditors, if there are any.

Decree reversed and record remitted, with directions to the Court below to distribute the fund in the hands of the accountant in accordance with the foregoing opinion, the costs of this appeal to be paid by the appellees.

CLARK, J., dissents.